UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLANIA

| | |
|---|---|
| ROBIN L. DYER, | : |
| | :CIVIL ACTION NO. 3:14-CV-1962 |
| Plaintiff, | : |
| | :(JUDGE CONABOY) |
| v. | : |
| | : |
| CAROLYN W. COLVIN, Acting | : |
| Commissioner of the Social | : |
| Security Administration, | : |
| | : |
| Defendant. | : |

_____

**MEMORANDUM**

Here we consider Plaintiff's appeal from the Commissioner's denial of Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act.  (Doc. 1.)  Plaintiff originally alleged disability due to back problems and a mini stroke, reporting an onset date of September 18, 2010.  (*See*, *e.g.*, R. 207, 212.)  The Administrative Law Judge ("ALJ") who evaluated the claim concluded that Plaintiff's severe impairments of back impairment, chronic obstructive pulmonary disease, affective disorder, and personality disorder did not meet or equal the listings alone or in combination with Plaintiff's obesity and non-severe impairments.  (R. 37-41.) The ALJ found that Plaintiff had the residual function capacity ("RFC") to perform light work with certain limitations and that such work was available in the national economy.  (R. 42-48.)  The ALJ therefore found Plaintiff was not disabled under the Act from

the alleged onset date of September 18, 2010, through the date of the decision and, therefore, denied her claim for benefits.  (R. 49.)

With this action, Plaintiff argues that the decision of the Social Security Administration must be reversed and the matter remanded for further proceedings on the following bases: the ALJ's finding that Plaintiff retained the RFC to perform a range of light work is not supported by substantial evidence; the ALJ failed to properly evaluate the medical and non-medical evidence; and the ALJ's step five finding lacks the support of substantial evidence. (Doc. 9 at 12.)   For the reasons discussed below, we conclude Plaintiff's appeal of the Acting Commissioner's decision is properly granted.

## I.Background

### A.   *Procedural Background*

On November 4, 2010, Plaintiff protectively filed applications for DIB and SSI.  (R. 35.)  As noted above, Plaintiff alleges disability beginning on September 18, 2010.[1]  (*Id.*)   In her application for benefits, Plaintiff claimed her ability to work was limited by back problems and a mini stroke.  (R. 212.)  The claim was initially denied on April 18, 2011.  (R. 35.)  Plaintiff filed a request for a review before an ALJ on June 6, 2011.  (R. 35.)  On

---

[1]   Plaintiff testified that this onset date followed her last unfavorable determination.  (R. 65.)

December 7, 2012, a video hearing was held by ALJ Jennifer Gale Smith.  (R. 57-87.)  Plaintiff appeared with her attorney, Benson Potzo.  (*Id.*)  The ALJ issued her unfavorable decision on December 17, 2012, finding that Plaintiff was not disabled under the Social Security Act.  (R. 49.)  On January 28, 2013, Plaintiff requested a review with the Appeal's Council.  (R. 31.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on August 15, 2014.  (R. 1-7.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On October 9, 2014, Plaintiff filed her action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on December 16, 2014.  (Docs. 5, 6.)  Plaintiff filed her supporting brief on March 2, 2015.  (Doc. 9.)  Defendant filed her opposition brief on May 4, 2015 (Doc. 14), after requesting and being granted an extension of time within which to do so (Docs. 10, 11).  Plaintiff did not file a reply brief and the time for doing so has passed.  Therefore, this matter is ripe for disposition.

**B.   *Factual Background***

Plaintiff was born on August 17, 1961, and was forty-nine years old on the alleged disability onset date.  (R. 48.)  She was fifty-one years old on the date last insured.  (Doc. 9 at 2.)  Plaintiff has a tenth grade education.  (*Id.*)  Plaintiff worked as a waitress and a cook (Doc. 9 at 3), work which is characterized as

3

unskilled (R. 48).  Plaintiff last worked in August 2007.  (R. 64.)

## 1.  Impairment Evidence

Because Plaintiff's claimed errors primarily address her back impairment, we focus on evidence related to the treatment, diagnosis and evaluation of her back-related problems.  Some evidence outside the relevant time period is reviewed to provide context.

On November 3, 2008, PA-C Jon Vogler noted that Plaintiff complained of right groin pain.  (R. 431.)  Progress Notes indicate this had been going on for three years, Plaintiff reporting that it hurt to walk, sitting for any length of time gave her a numb feeling down the right upper leg to her knee, and she had a compression fracture of the lumbar spine ten to fifteen years before.  (*Id.*)  Back examination was normal except for spinal tenderness and no other musculoskeletal problems were noted.  (*Id.*)  The groin pain was assessed to be from the lower back and Plaintiff was directed to use heat and do back exercises.  (*Id.*)  She was also prescribed Flexeril and a lumbar spine x-ray was ordered.  (R. 432.)

A November 3, 2008, x-ray of Plaintiff's lumbar spine showed minimal compression deformity at L1 level associated with degenerative disc disease.  (R. 348.)

Plaintiff complained of back and hip pain on November 20, 2008, tenderness was noted on examination, and SI joint arthralgia

4

was assessed. (R. 430.)

On January 3, 2009, the report of Plaintiff's MRI of the lumbar spine indicated the following Impression: "essentially negative MR examination of the lumbar spine with disk desiccation of the L1-L2 intervertebral disk."  (R. 349.)

On March 19, 2009, Plaintiff saw Ronald E. DiSimone, M.D., who reported that Plaintiff presented with continued right lower extremity pain and injection into the SI joint had provided only several days of relief.  (R. 570.)  Her primary symptoms were complaints of pain down the front of the thigh to the anterior pre-tibia on the right with a rather severe walking intolerance but no problem sitting.  (*Id.*)  Physical examination showed some tenderness in the mid-lumbar region, tender right SI joint, non-tender left SI joint, non-tender sciatic notch bilaterally, some hip flexor weakness, some right knee extensor weakness, deep tendon reflexes trace for patellar tendon on the right, 1+ on the left, ankle reflex trace, and symmetric bilateral lower extremities. (*Id.*)  X-rays showed unstable Grade I spondylolisthesis primarily L3-4 on flexion/extension views.  (*Id.*)  AP showed mild list. (*Id.*)  Lumbar MRI showed no obvious spinal stenosis or HNP.  (*Id.*) Dr. DiSimone's impression was Grade I unstable spondylolisthesis primarily L3-4 and mechanical low back pain with right lower extremity cauda equina radiculopathy.  (*Id.*)  He wanted Plaintiff to have a thoracic MRI to rule out HNP versus spinal stenosis and

he wanted a consultation with Dr. Hani Tuffaha regarding right

lower extremity radiculopathy.  (*Id.*)

An April 24, 2009, correspondence from Hani J. Tuffaha, M.D.,

to whom Plaintiff was referred by Ronald DiSimone, M.D., for

neurological evaluation, reports the following findings on

examination:

> Examination of the low back reveals moderate
> limitation of range of motion at the waist in
> all directions, especially on extension.
> There is no tenderness to percussion over the
> lumbosacral area.  There is no paravertebral
> muscle stiffness.  There is no scoliosis or
> kyphosis.  Sciatic notches are not tender.
> Left straight leg raising up to 90 degrees,
> in the seated position, results in no
> difficulty, with absent Bragard's and
> Fajersztajn's.  Right straight leg raising up
> to 90 degrees, in the seated position,
> results in no difficulty, with absent
> Bragard's and Fajersztajn's.  There are no
> intrinsic mechanical signs in the hips.
> Femoral nerve stretching test is negative on
> the left and on the right increases the low
> back pain.  Motor examination reveals light
> weakness of the right iliopsoas.  There is no
> demonstrable sensory deficit.  Deep tendon
> reflexes are 2+ and symmetrical.  The toes
> are downgoing and there is no ankle clonus.
> There is no focal atrophy or fasciculation.
> Gait is steady.

(R. 591.)  Dr. Tuffaha reviewed dynamic lumbar spine x-rays dated

March 19, 2009, and reported that they showed Grade I

retrolisthesis of L3 on L4 and Grade I retrolisthesis of L5 and S1.

(*Id.*)  He also reported that there was an old superior compression

deformity of L1, adding that he felt the films were somewhat

rotated, and the January 3, 2009, MRI showed mild degenerative

6

changes with no evidence of root compression.  (R. 591-92.)   His
Impression was "[i]ntractable low back pain, which could be
mechanical with right anterior thigh pain, suggestive of
radiculopathy."  (R. 592.)  He recommended repeat dynamic lumbar
spine x-rays, and referred Plaintiff to Dr. Rigal for pain
management.  (*Id.*)

On May 5, 2009, Plaintiff had x-rays of the lumbar spine.  (R.
593.)  The results were compared with the November 3, 2008, and
January 3, 2009, studies.  (*Id.*)  The Impression indicated a
compression fracture involving the superior endplate of the L1
vertebral body which was new compared with the previous studies,
T12-L1 and L1-L2 disk space narrowing, and normal vertebral
alignment in neutral, flexion and extension.  (*Id.*)

On May 11, 2009, Plaintiff saw Rene R. Rigal, M.D., for pain
management.  (R. 571.)  Physical examination revealed that
Plaintiff was alert and oriented in time, space and person.  (R.
572.)  She had no pain upon movement of the spine at the waist, no
pain on forward flexion to ninety degrees, lateral rotation to
twenty degrees, and lateral tilt or hyper extension to twenty
degrees.  (*Id.*)  Straight leg raising was negative to ninety
degrees, deep tendon reflexes were preserved bilaterally and
symmetrical, Plaintiff had no motor or sensory deficits, no clonus,
and a Babinski sign was downgoing.  (*Id.*)  Palpation of Plaintiff's
back demonstrated no paraspinal tenderness, and no tenderness of

7

the sacroiliac joints or the sciatic notch. (*Id.*) Dr. Rigal noted mechanical signs in the right hip with pain on internal and external rotation. (*Id.*) He also noted "exquisite pain on deep palpation of the right subtrochanteric bursa with radiation down the fascia lata." (*Id.*) Patrick's sign and Yeoman sign were both negative bilaterally. (*Id.*) His diagnosis was pain in the right hip, right subtrochanteric bursitis, and right sacroiliitis. (R. 572.) His plan was to get further x-rays, give Plaintiff a right subrochanteric bursa injection, and demonstrate home exercises which she should do four times per day. (*Id.*)

On June 1, 2009, Plaintiff again saw Dr. Rigal, reporting that the bursa injection had decreased her right lower extremity pain but she presented with pain in the right lumbosacral region. (R. 575.) The pain increased with prolonged sitting or doing any type of mechanical movement at the waist. (*Id.*) Dr. Rigal noted the following: Plaintiff had sustained a fracture of L1 several years before; the May 5, 2009, x-rays of the lumbar spine demonstrated evidence of an L1 vertebral body fracture and normal vertebral alignment in neutral flexion and extension; the January 3, 2009, MRI of the lumbar spine was normal; and the April 24, 2009, MRI of the thoracic spine demonstrated mild signal intensity changes of the left side of the body of T1. (*Id.*) He further noted that X-rays of both hips did not show any significant DJD. (*Id.*) Plaintiff denied any radicular pain into the lower extremities, any

weakness in the lower extremities, or any loss of sphincter control.  (*Id.*)

Physical examination revealed that Plaintiff was alert and oriented in time, space and person.  (R. 576.)  She had no pain upon movement of the spine at the waist, no pain on forward flexion to ninety degrees, lateral rotation to twenty degrees, and lateral tilt or hyper extension to twenty degrees.  (*Id.*)  Straight leg raising was negative to ninety degrees, deep tendon reflexes were preserved bilaterally and symmetrical, Plaintiff had no motor or sensory deficits, no clonus, and a Babinski sign was downgoing. (*Id.*)  Palpation of Plaintiff's back demonstrated paraspinal tenderness at the right lumbosacral junction, and no tenderness of the sacroiliac joints or the sciatic notch.  (*Id.*)  Dr. Rigal again noted mechanical signs in the right hip with pain on internal and external rotation, "exquisite pain on deep palpation of the right subtrochanteric bursa with radiation down the fascia lata," and Patrick's sign and Yeoman sign were both negative bilaterally. (*Id.*)  His diagnosis was pain in the right hip, right subtrochanteric bursitis, and right sacroiliitis.  (R. 572.)  His plan was to perform facet joing injections, and demonstrate home exercises which Plaintiff should do four times per day.  (*Id.*)  Dr. Regal administered the facet joint injections.  (R. 574.)

Plaintiff's June 22, 2009, visit to Dr. Rigal showed the same findings on physical examination and same diagnosis.  (R. 578.)

Plaintiff had another facet joint injection.  (R. 577.)

Plaintiff's July 27, 2009, visit showed the same physical findings and indicates the same diagnosis.  (R. 580.)  Dr. Rigal noted that he would schedule Plaintiff for "facet joint ablations and right L3-4, L4-5 and L5-S1" on October 9, 2009.  (*Id.*)

On August 31, 2009, Dr. Rigal made the same physical findings and diagnosis.  (R. 582.)  He noted the exam was consistent with right sacroiliitis.  (*Id.*)  He further noted that Plaintiff's pain in the right sacroiliac joint could be secondary to facet disease at L4-5, and L5-S1, and it was possible she had both facet arthrosis and a right sacroiliitis (secondary to ambulation abnormality).  (*Id.*)  He performed a right sacroiliac joint injection and planned to see Plaintiff in three weeks.  (*Id.*)

On September 22, 2009, Plaintiff wanted to discuss any other further therapy for her back pain and the recurrence of right hip pain.  (R. 585.)  Dr. Rigal noted that the facet joint injections totally eradicated the right-sided axial lower back pain for four days, "demonstrating that indeed the facet complexes and right L3-4, L4-5 and L5-S1 are important in pain generators."  (*Id.*)  Dr. Rigal made the same physical examination findings as in previous months.  (R. 586.)  His diagnosis remained right sacroiliitis, pain in the right hip, and right subtrochanteric bursitis.  (*Id.*)  He planned to schedule Plaintiff for radiofrequency neurolysis of the facet complexes and L3-4, L4-5 and L5-S1.  (*Id.*)  He planned to

10

treat Plaintiff's subtrochanteric bursitis conservatively with home-based exercises.  (*Id.*)

Based on a diagnosis of lumbar spondylosis, Dr. Rigal performed the radiofrequency neurolysis on October 9, 2009.  (R. 587.)

On November 3, 2009, Plaintiff presented to Dr. Rigal with no axial low back pain but complained of pain in the right buttocks in the distribution of the right sacroiliac joint.  (R. 589.)  She reported that the pain got worse with prolonged sitting.  (*Id.*) Physical examination was similar to the preceding months except there was tenderness of the sacroiliac joints or sciatic notch. (*Id.*)  Diagnosis was right sacroiliitis only.  (*Id.*)  Dr. Rigal offered Plaintiff another injection in the right sacroiliac joint but she declined.  (*Id.*)  Dr. Rigal asked her to do home-based exercise.  (*Id.*)

On November 27, 2009, Dr. Tuffaha re-evaluated Plaintiff.  (R. 594.)  Plaintiff reported that she continued to have severe low back, right hip and anterior thigh pain to the knee with associated weakness.  (*Id.*)  She said she had fallen three times since her last visit in April, and she had no relief from the injections and nerve ablation performed by Dr. Rigal.  (*Id.*)  Dr. Tuffaha noted that Plaintiff's mechanical and neurological examinations remained unchanged, she had moderately painful external rotation of the right hip and minimally painful on the left.  (*Id.*)  He also noted

11

that the May 5, 2009, dynamic lumbar spine x-rays showed no offsets or segmental instability, and superior compression deformity of L1. (*Id.*)  Dr. Tuffaha's Impression was intractable unrelenting low back and right anterior thigh pain, suggestive of L1 radiculopathy. (*Id.*)  He planned to get a follow-up lumbar MRI and a bone scan with attention to the lumbar spine and right hip.  (*Id.*)

On December 8, 2009, Plaintiff had MRI of the lumbar spine. (R. 595.)  It showed no disc herniation, some disc bulging predominantly at the L5-S1 level, no spinal canal stenosis, and some spondylotic changes in the spine.  (*Id.*)  She also had a bone scan which showed no scintigraphic evidence of trauma, tumor, or infection in the lumbar spine.  (*Id.*)

At her visits to Laurel Health Center in April, May, June and December of 2009, no mention was made of back and hip problems. (R. 424, 425, 426, 429.)

On January 19, 2010, Dr. Tuffaha noted that a December 8, 2009, study showed "severe degenerative changes.  The chronic mild compression L4 deformity is again noted.  There is chronic disc bulge at L5-S1."  (R. 599.)  On physical examination, he found plaintiff to have moderately limited range of motion, especially on extension, negative straight leg raise bilaterally, moderately painful external rotation of the right hip and minimally painful on the left, the femoral nerve stretch test increased her low back pain on the right, motor exam revealed some slight weakness of the

12

right ilipsoas, sensory exam was intact, deep tendon reflexes 2+ and symmetrical, and Plaintiff's gait was steady.  (R. 600.)  Dr. Tuffaha's Impression was intractable, unrelenting low back pain and right anterior thigh pain suggestive of L3 radiculopathy.  (R. 601.)  His plan was to admit Plaintiff for lumbar myelography for further evaluation of her lumbar spine.  (*Id.*)

On January 19, 2010, Plaintiff had a lumbar myelogram.  (R. 602.)  No abnormalities were demonstrated.  (*Id.*)  CT of the lumbar spine on the same date found no evidence of lumbar disc disease, central canal stenosis, or neural foraminal stenosis.  (R. 603.)

An EMG was performed on February 4, 2010, to rule out radiculopathy versus neuropathy.  (R. 604.)  The findings were normal and showed no electrodiagnostic evidence of peripheral neuropathy or right lumbar radiculopathy.  (*Id.*)

Plaintiff saw Mr. Vogler on March 8, 2010, with the chief complaint of back pain.  (R. 423.)  He noted that Plaintiff "wants referral to neurosurgeon for arthritis, saw Dr. Tafaha [sic] who couldn't see anything wrong." (*Id.*)   Examination of her back showed spinal tenderness lumbar sacral, decreased range of motion, straight leg raising pain on the right, and cross-over left leg pain.  (R. 423-24.)  The Assessment was backache unspecified and lumbar disc degeneration.  (*Id.*)  The Plan was "patient education." (*Id.*)

On March 30, 2010, Plaintiff saw neurosurgeon Carson Thompson,

13

M.D., complaining of intermittent right hip and groin pain with occasional buckling of the right leg especially when standing, walking or sitting for long periods of time.  (R. 302.) Musculoskeletal examination showed that Plaintiff exhibited tenderness, had a negative strait leg raise bilaterally, pain in the right hip with internal and external rotation of right leg but not left, Plaintiff claimed pain with percussion over right hip, she was able to flex to sixty degrees and hyperextend and laterally flex without back pain but complained of right groin pain.  (R. 304.)  Dr. Thompson diagnosed degeneration of lumbar or lumbosacral intervertebral disc.  (*Id.*)  He also reviewed the MRI with Plaintiff, noting no significant findings in the spine other than DJD L12 possibly due to an old compression fracture.  (*Id.*)  He concluded that Plaintiff's symptoms and his findings were consistent with right hip disease or possible bursitis, and he suggested NSAIDS and evaluation by an orthopedist as he had nothing to surgically offer Plaintiff for her problem.  (*Id.*)

On July 7, 2010, Plaintiff reported to Mr. Vogler that she was no longer attending PT due to more severe pain.  (R. 417.)  On examination, her back was normal except for spinal tenderneess in the lower lumbar region with point tenderness over the right SI joint.  (R. 418.)  The right SI joint was injected.  (*Id.*)

On July 27, 2010, Mr. Vogler noted Plaintff's hip pain had improved after injection at her last visit but it was worse again

14

due to falling on July 23, 2010.  (R. 416.)  Musculoskeletal examination showed that Plaintiff had pain and point tenderness over the right greater trochanter.  (*Id.*)

At her visits with Mr. Vogler on August 23, August 25 and August 31, 2010, back-related problems were not mentioned subjectively or objectively.  (R. 413, 415.)  No back problems were mentioned subjectively or objectively when Plaintiff saw Mr. Vogler on September 21, 2010, and October 26, 2010.  (R. 872, 875-76.) (Plaintiff's September 21, 2010, visit was the first medical encounter following the alleged disability onset date of September 18, 2010.  (*See* R. 35.))

On November 20, 2010, Plaintiff presented to Mr. Vogler with back and hip pain. (R. 430.)  On examination, Mr. Vogler recorded pain and point tenderness in the right SI joint that radiated into the right buttocks.  (*Id.*)  He diagnosed SI joint arthralgia and again injected the right SI joint.  (*Id.*)

On December 18, 2010, Plaintiff saw PA-C Daria Lin-Guelig because of sinus pain and pressure.  (R. 870-71.)  No back problems were mentioned subjectively or objectively.  (*Id.*)

On January 7, 2011, Plaintiff presented to Mr. Vogler complaining of pain rated four out of five in her lower back down her right leg; she said she "wanted a scan."  (R. 867.)  He noted Plaintiff reported the pain was constant and she had occasional instability of the right leg.  (*Id.*)  Plaintiff also reported that

15

she had seen numerous specialists "and there is nothing they can do." (*Id.*)

On January 25, 2011, Plaintiff saw Mr. Vogler for follow up of her "lumbar disc disease, hyperlipidemia, TIA, and pain med." (R. 865.)  She was also complaining of severe body pain because of the weather. (*Id.*)  On objective evaluation, "General" was recorded to be "normal except chronically ill appearing, using a cane." (R. 866.)

On March 15, 2011, plaintiff presented to Mr. Vogler with complaints of abdominal bloating and pain in her head.  (R. 863.)  Physical examination of her back showed the spine was normal without tenderness and no CVA tenderness.  (R. 864.)

On March 16, 2011, Plaintiff had a consultative examination with Craig Nielsen, M.D.  (R. 498-505.)  Plaintiff reported that she had a lot of low back pain, that her right leg gives out on her, and that treatment to that point had been unsuccessful.  (R. 498-99.)  She said she had seen a neurosurgeon (Dr. Tuffaha), an orthopedist (Dr. DiSimone), a pain managment specialiast (Dr. Rigal), and a back specialist (Dr. Thompson) at Robert Packer, all of whom reported that they could not do anything for her.  (R. 498.)  Regarding medications, Plaintiff said she had not taken any pain medication that day because she had to drive to the appointment.  (R. 500.)  She reported that she generally takes pain medication when the weather is bad.  (*Id.*)  Dr. Nielsen asked: "So

16

for the most part you do not need to take the pain pill and you are okay in between bad weather times?" (*Id.*)  Plaintiff replied: "Yes, I'm okay if I just do not over do it.  For example, if I go grocery shopping, by the time I get home, I am exhausted." (*Id.*) Plaintiff clarified that she can drive, but only for short distances because her right leg goes numb. (*Id.*)  Dr. Nielsen reported that Plaintiff "admits she does the usual house work: dusting, cleaning, vacuuming, and cooking 'if I can do it.'" (*Id.*)

Physical examination of her back showed that it was straight with slight tenderness along the lumbar spine.  (R. 501.)  Dr. Nielsen reported that examination of Plaintiff's extremities was unremarkable, and he included observations that Plaintiff's gait was normal, she got in and out of the chair and on and off the examination table well, straight leg raising was negative, there was no wasting, the range of motion was normal, and he elicited no pain.  (R. 502.)  Dr. Nielsen found that Plaintiff sits, bends, stands, walks, lifts, and grasps normally; she squats and unsquats well and heel and toe walks well.  (*Id.*)  Bending at the waist was limited to seventy of ninety degrees with Plaintiff reporting that it hurt too much to go any further.  (*Id.*)  Dr. Nielsen noted that Plaintiff reported pain in her right lateral hip when he was testing for straight leg raising.  (*Id.*)  He observed Plaintiff leaving the office, noting that she walked briskly with a slight limp in her left leg, went down the three steps one at a time, and

used her cane lightly. (*Id.*)  Dr. Nielsen had previously asked her about the cane, and she said that Mr. Vogler wanted her to use it because sometimes her left leg gives out." (*Id.*)  She added that she did not use it around the house.  (*Id.*)  Dr. Nielsen stated that it appeared that Plaintiff had "psychoneurotic intermittent numbness of the left arm and leg," a history of low back pain, depression (treated), and a stated history of emphysema.  (R. 502.) He opined that Plaintiff did not have any limitations in the areas identified in the assessment form.  (R. 504-05.)

On March 29, 2011, Plaintiff was evaluated by consultative examiner Michael Palmer, Ed. D.  (R. 483-95.)  He recorded under "General Appearance" that Plaintiff's gait was notably altered with a significant limp on the right side, she held her cane on her right side, and her sitting posture was poor in that she leaned to the left side with her right shoulder pulled forward.  (R. 488.) He stated that Plaintiff's concentration was notably poor, her persistence was diminished by her pain syndrome and "the belief that she cannot do anything about it.  Her pace is quite slow at this time." (R. 492.)  He found Plaintiff had moderate restrictions in the following areas: understand and remember short, simple instructions; carry out short, simple instructions; understand and remember detailed instructions; carry out detailed instructions; and make judgments on simple work-related decisions. (R. 494.)  He opined that Plaintiff's ability to respond

18

appropriately to supervisors, co-workers and work pressures in a work setting were affected by her impairment, the only "marked" limitation being her ability to respond appropriately to changes in a routine work setting.  (*Id.*)  He noted that Plaintiff's prognosis was guarded: she may benefit from an appropriate exercise program with very gradual increasing demands and benefit from counseling regarding dealing with chronic pain.  (R. 491.)

On April 12, 2011, Plaintiff saw Mr. Vogler to discuss test results related to an emergency room visit on April 5th unrelated to her back problems.  (R. 861.)  Plaintiff's back issues were not mentioned subjectively or objectively at the visit.  (R. 861-62.)

On May 2, 2011, Plaintiff presented to Mr. Vogler complaining of continued back pain and ineffectiveness of pain medication-- reporting that where it used to take the pain away and she could do things, now she could not.  (R. 858.)

On June 15, 2011, Plaintiff saw Mr. Vogler for follow up on oxycontin and Dexilant.  (R. 855.)  He noted that Plaintiff said she was doing well on the medications and was not having any problems but she complained of pain on the left side of her back, stating that it used to be on the right side.  (*Id.*)  Her back examination was normal except for spinal tenderness in the thoracic lumbar region.  (R. 856.)

A review of Progress Notes from Plaintiff's visits with Mr. Vogler on August 18, 2011, August 31, 2011, September 8, 2011,

September 20, 2011, October 13, 2011, November 4, 2011, January 3, 2012, and February 7, 2012, showed no subjective or objective reports of back-related problems.  (*See* R. 833, 837, 840, 841, 844, 852, 849, 847.)

On March 13, 2012, Plaintiff reported to Mr. Vogler that her right knee had been swollen and she experienced pain throughout the joint when standing.  (R. 830.)  He noted "it is unclear if the pain originates in her knee or in fact comes from her SI joint when she has been standing."  (*Id.*)  Physical examination of her back was normal except for some pain in the right SI joint to palpation which radiated over the buttocks, examination of the right knee showed tenderness through the medial joint space.  (R. 831.)  Mr. Vogler recorded the following:

> Robin was given oxycodone and she loves it. She says she has no pain when she takes it, although she has to take 2 every 4 hrs.  She is requesting a months [sic] supply @ 2 every 4 to 6 hrs.  She has had 2 MRI's of her L-spine over the past 3 years without any impingement at all.  She has been to pain management and PT without any relief.  She has been to PT, but never finished the visits because she says there is too much pain involved.

(R. 858.)  Physical examination of Plaintiff's back was normal except for spinal tenderness "in the region."  (R. 859.)  Assessment was recorded as "Back pain ? etiology."  (*Id.*)

On March 21, 2012, Plaintiff saw vascular surgeon Lawrence Sampson, M.D., because of reportedly experiencing a TIA the month

before.  (R. 1006.)  Plaintiff stated that she could do ten minutes on a treadmill and was trying to work her way up.  (R. 1007.)  She reported that before she got sick in August 2011 with Legionnaire's disease, she was able to walk a mile or mile and a half.  (*Id.*)

On November 21, 2012, Plaintiff saw Mr. Vogler with the chief complaint of back pain which she rated as five on a scale of one to ten.  (R. 1021.)  She reported that she had fallen twice in the preceding week because her right leg had given out on her and since then she had back pain.  (*Id.*)  Mr. Vogler notes the following: "Her disease is not operable and she says she would not consider it at this time.  She has a walker that she uses at home."  (*Id.*)

## 2.   **Opinion Evidence**

On July 28, 2010, Jon L. Vogler, PA-C, completed a medical report form stating that he began treating Plaintiff on October 31, 2007, and last treated her on July 28, 2010.  (R. 314.)  Though the handwriting is difficult to read, Mr. Vogler apparently states that Plaintiff walks with a cane and has low back pain.  (*Id.*)  He includes a December 2009 MRI of the spine in the laboratory findings portion of the form and lists a diagnosis of "intractable low back pain," with a marginal response to treatment and guarded prognosis.  (*Id.*)

On July 23, 2010, chiropractor Steven L. Heffner, completed a Medical Source Statement of Ability To Do Work-Related Activities. (R. 315.)  Dr. Heffner concluded that Plaintiff could occasionally

lift and carry up to ten pounds, noting the following: "If floor to waist lift before carry object then cannot carry any weight.  Lift causes right leg limp making carry unsafe." (*Id.*)  Considering sitting, standing, and walking at one time without interruption, he found that Plaintiff could sit for approximately three and one-half minutes, stand for four and one-half minutes with a cane, and walk with a cane for almost five minutes.  (R. 316.)  Considering how long Plaintiff could sustain the same activities as a total in an eight-hour day, Dr. Heffner opined that Plaintiff could sit for two hours, and she could stand and walk for two hours with a cane. (*Id.*)  The form then posed the following question: "If the total time for sitting, standing and walking does not equal or exceed 8 hours, what activity is the individual performing for the rest of the 8 hours?" (*Id.*)  Dr. Heffner answered: "Lying down in recliner.  I totaled up the time she could sit/stand/walk before changing positions and extrapolated." (*Id.*)  He said Plaintiff medically required a cane to ambulate and without it she could walk .05 mile. (*Id.*)  This assessment was supported with the explanation that Plaintiff's right leg gives out intermittently with walking or standing and it had done so during an exam with squatting and rising from sitting. (*Id.*)  He further opined that Plaintiff, who is right-handed, could reach, handle, finger, feel, and push/pull occasionally. (*Id.*)  He supported his assessment with the notation that reaching is limited because of the need to

use a cane, and she could perform handling, fingering, and feeling but she was unable to sit or stand for more than a few minutes due to lower back pain.  (*Id.*)  Dr. Heffner found that Plaintiff could never operate foot controls with her right foot because of foot weakness (noting Plaintiff "cannot drive"), and she could occasionally operate foot controls with her left foot but it was limited because she could not sit for more than a few minutes due to low back pain.  (R. 317.)  He concluded that Plaintiff could climb stairs and ramps occasionally and could never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl because she needs a cane to ambulate and stand and these activities would be unsafe.  (R. 318.)  Under environmental limitations, Dr. Heffner opined that Plaintiff could never tolerate exposure to unprotected heights, moving mechanical parts, or operate a motor vehicle due to the use of a cane and right lower extremity weakness.  (R. 319.)  He found that Plaintiff could never be exposed to vibrations (noting that literature supports vibration increases LBP), and she could occasionally be exposed to humidity and wetness, extreme cold and extreme heat.  (*Id.*)  He noted that Plaintiff was able to do the following: shop; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes or two crutches; use standard public transportation; climb a few steps at a reasonable pace with the use of a single hand rail; prepare a simple meal and feed herself; care of personal hygiene; and sort,

23

handle or use paper files.  (R. 320.)  He noted she was unable to walk a block at a reasonable pace on rough or uneven surfaces. (*Id.*)  He stated that the limitations he identified were first present in August 2007 and they either had lasted or were expected to last for twelve consecutive months.  (*Id.*)

As set out above, on March 16, 2011, Dr. Nielsen examined Plaintiff and found that Plaintiff had no limitations.  (R. 497-505.)

On April 18, 2011, Mark Bohn, M.D., completed a physical RFC assessment.  (R. 531-26.)  He opined that Plaintiff had the following limitations: she could lift and carry twenty pounds occasionally and ten pounds frequently; she could stand, walk or sit for about six hours of an eight hour day; she could occasionally climb, balance, stoop, kneel, crouch, and crawl; and she had to avoid concentrated exposure to extreme cold and hazards (machinery, heights, etc.)  (R. 531-33.)  Dr. Bohn concluded that Plaintiff had no manipulative, visual, or communicative limitations.  (R. 532-33.)  In the narrative portion of his assessment, Dr. Bohn reviewed Plaintiff's activities of daily living, noting that she uses but does not require an assistive device to ambulate, her symptoms are not completely controlled with medication, and she has received treatment that is essentially routine and conservative.  (R. 535.)  He explained the weight he gave other assessments of record and why his assessment differed in

24

certain respects; where he found Plaintiff to be less limited, he noted that he did not find the more severe limitations consistent with all of the medical and non-medical evidence.  (R. 535-36.)

On February 5, 2012, Mr. Vogler completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Activities. (R. 538-39.)  He opined that Plaintiff could occasionally lift and carry ten pounds because she has lumbar disc disease and chronic pain syndrome and uses a cane for her right leg limp so carrying is unsafe.  (R. 538.)  Regarding standing and walking, Mr. Vogler noted only that Plaintiff uses a cane for ambulation due to severe back pain.  (*Id.*)  He opined that she can sit for less than one hour and cannot sit long without changing positions, and that her pushing and pulling were limited because of the cane.  (*Id.*) Regarding postural activities, Mr. Vogler reported that Plaintiff could never bend, kneel, stoop, crouch or balance and she could occasionally climb, again citing the use of the cane as supportive of the findings.  (R. 539.)  Mr. Vogler concluded that Plaintiff could never be exposed to heights or moving machinery and occasionally vibration, wetness and noise.  (*Id.*)

On December 3, 2012, Dr. Heffner completed a Multiple Impairment Questionnaire.  (R. 1036.)  He noted that he had treated Plaintiff since September 2008 and treated her monthly.  (*Id.*)  He opined that Plaintiff was "permanently disabled" due to degenerative disc disease and chronic pain syndrome.  (*Id.*)

Supportive clinical findings were identified as severe back and right hip pain, Plaintiff has a hard time standing, she uses a cane, and some days uses a walker.  (*Id.*) The frequency of the pain was identified as "constant daily" and the pain was precipitated by standing, walking, bending, lifting, twisting, sitting and reaching.  (R. 1029.)  Dr. Heffner opined that Plaintiff could sit for four hours and stand or walk with a cane for two hours of an eight hour day.  (*Id.*)  He stated that Plaintiff could never lift or carry, and was limited in reaching, handling, and fingering. (R. 1030.)  He also concluded Plaintiff's symptoms would likely increase in a competitive work environment, pain would constantly interfere with her attention and concentration, her impairments were expected to last for at least twelve months, emotional factors contribute to the severity of her symptoms, and she was not a malingerer.  (R. 1031-32.)  Dr. Heffner believed Plaintiff would need unscheduled breaks, noting that she would have to change positions every five minutes, and her impairments would likely cause her to miss work more than three times per month.  (R. 1032-33.)

3.   **Hearing Testimony**

At the December 7, 2012, hearing, Plaintiff identified her main problems as degenerative disc disease, COPD, and depression. (R. 72.)  She said she can walk twenty to thirty feet, cannot stand or sit for very long, can lift about four pounds, cannot push and

pull, has difficulty handling objects, has numbness in her legs, and has difficulty climbing stairs. (R. 73-74.) Plaintiff testified that she can take care of her personal needs but uses a shower chair. (R. 76-77.) When asked about household chores and maintenance, she stated that her daughter-in-law or husband tend to almost everything but she tries to do the shopping in a mobilized wheelchair. (R. 77-79.) Plaintiff described the pain related to her degenerative disc disease as constant and stabbing, it wakes her up every two hours, and she only gets relief if she takes oxycontin. (R. 81-82.) She stated that the cane was prescribed by Mr. Vogler in 2008 (R. 64, 65) and she also uses a walker which was prescribed "[b]ecause they're afraid I'm going to be falling and getting hurt or breaking a hip" (R. 82). When Plaintiff's attorney asked when she had last fallen or gotten hurt, Plaintiff replied it had been in November. (R. 82.) Plaintiff testified that she spends about twelve hours in her recliner on a typical day (*id.*), and she was unable to drive because her right leg goes numb and she does not trust herself (R. 66).

Following Plaintiff's testimony, her attorney, Benson Potzo, addressed the ALJ, asserting that Plaintiff's limitations precluded her from going back to her past relevant work as a cook or waitress. (R. 85.) He added, "[a]nd as of her 50th birthday, I do contend that, at the very least, she is sedentary." (*Id.*) When asked to identify the basis for his assertion, Mr. Potzo pointed to

a questionnaire in the record which he believed quantified her testimony.  (*Id.*)  When asked about objective supporting evidence, he again pointed to the questionnaire, specifically identifying the exhibit which is Dr. Heffner's December 2012 Multiple Impairment Questionnaire.  (R. 86.)  Mr. Potzo also pointed to "the mere fact that she has been prescribed a cane and a walker [as] kind of conclusory evidence that she can definitely not go back to her past relevant work."  (R. 86.)

## 4.  **ALJ Decision**

By decision of December 17, 2012, ALJ Jennifer Gale Smith determined that Plaintiff was not disabled as defined in the Social Security Act. (R. 50.)  She made the following findings of fact and conclusions of law:

> 1.  The claimant meets the insured status requirements of Social Security Act through September 30, 2012.
>
> 2.  The claimant has not engaged in substantial gainful activity since September 18, 2010, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).
>
> 3.  The claimant has the following severe impairments: back impairment, chronic obstructive pulmonary disease, affective disorder, and personality disorder (20 CFR 404.1520(c) and 416.920(c)).
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d),404.1525, 404.1526,

416.920(d), 416.925 and 416.926).

5.   After careful consideration of the
     entire record, the undersigned finds
     that the claimant has the residual
     functional capacity to lift and/or carry
     20 pounds occasionally, ten pounds
     frequently, sit for six hours in an
     eight-hour day, and stand and/or walk
     for six hours in an eight-hour day.  The
     claimant should avoid unprotected
     heights and should have only occasional
     exposure to extreme cold and respiratory
     irritants.  Due to her mental
     impairments, the claimant is limited to
     simple, unskilled work.  She retains the
     ability to continuously understand,
     carry out, and remember simple
     instructions, respond appropriately to
     supervision, coworkers, and usual work
     situations, and deal with changes in a
     routine work setting.  This is
     consistent with the ability to perform
     less than the full range of light work
     as defined in 20 CFR 404.1567(b) and
     416.967(b).

6.   The claimant is unable to perform any
     past relevant work (20 CFR 404.1565 and
     416.965).

7.   The claimant was born on August 17, 1961
     and was 49 years old, which is defined
     as a younger individual age 18-49, on
     the alleged disability onset date.  The
     claimant subsequently changed age
     category to closely approaching advanced
     age (20 CFR 404.1563 and 416.963).

8.   The claimant has a limited education and
     is able to communicate in English (20
     CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an
     issue in this case because the
     claimant's past relevant work is
     unskilled (20 CFR 404.1568 and 416.968).

29

10. Considering the claimant's age,
    education, work experience, and residual
    functional capacity, there are jobs that
    exist in significant numbers in the
    national economy that the claimant can
    perform (20 CFR 404.1569, 404.1569(a),
    416.969, and 416.969(a)).

11. The claimant has not been under a
    disability, as defined in the Social
    Security Act, from September 18, 2010,
    through the date of this decision (20
    CFR 40-4.1520(g) and 416.920(g)).

(R. 37-49.)  The ALJ carefully reviewed the many impairments noted

in the record and explained how she determined that Plaintiff had

the severe impairments noted above.  (R. 37-38.) She stated that

she had considered the effects of Plaintiff's obesity as required

by SSR 02-1p.  (R. 38.)  ALJ Smith also reviewed the impairments

which she considered non-severe or non-medically determinable,

explaining the designation assigned.  (R. 38-40.)

In explaining Plaintiff's RFC, the ALJ reviewed the extensive

medical evidence and the weight given to Plaintiff's subjective

complaints and opinions contained in the record.  (R. 42-48.)  She

noted that Dr. Heffner's and Mr. Vogler's opinions were not

entitled to controlling weight because neither a chiropractor nor

physician's assistant are "acceptable medical sources" and two

opinions from "acceptable medical sources," those of Dr. Nielsen

and Dr. Bohn, contradicted both Dr. Heffner's and Mr. Vogler's

opinions.  (R. 46.)  The ALJ stated that she gave Dr. Nielsen's

opinion some weight--although he found Plaintiff had no

limitations, the ALJ found some limitations based on her subjective complaints stemming from her back impairment "even though the objective evidence is minimal," and some environmental restrictions related to her respiratory impairment.  (R. 46.)  The ALJ gave great weight to Dr. Bohn's opinion in determining Plaintiff's RFC, noting that, based on Plaintiff's respiratory impairment, she would add some environmental limitations which Dr. Bohn did not include. (R. 47.)  ALJ Smith also reviewed Plaintiff's testimony and the evidence of record regarding Plaintiff's use of a cane, finding that the medical evidence did not support her allegations.  (R. 45.)

Concluding that Plaintiff was capable of performing less than a full range of light work, the ALJ made her step five determination without the assistance of a vocational expert because she found that the Administration's Social Security Rulings provided sufficient guidance for determining if a significant number of jobs existed in the national economy.  (R. 49.)  She specifically noted that Plaintiff's environmental restrictions had little or no effect on the occupational base of unskilled light work pursuant to Social Security Ruling 85-15.  (*Id.*)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[2]  It is necessary for the
Commissioner to ascertain: 1) whether the applicant is engaged in a
substantial activity; 2) whether the applicant is severely
impaired; 3) whether the impairment matches or is equal to the
requirements of one of the listed impairments, whereby he qualifies
for benefits without further inquiry; 4) whether the claimant can
perform his past work; 5) whether the claimant's impairment
together with his age, education, and past work experiences
preclude him from doing any other sort of work.  20 C.F.R. §§
404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.
521, 110 S. Ct. 885, 888-89 (1990).

　　　If the impairments do not meet or equal a listed impairment,
the ALJ makes a finding about the claimant's residual functional

_____

　　　[2]  "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less that 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e).  The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found that Plaintiff was capable of performing jobs that exist in significant number in the national economy.  (R. 48-49.)

### III. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third

Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result

34

but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary,

in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).  It is the ALJ's responsibility to explicitly provide reasons for his decision and analysis later provided by the defendant cannot make up for analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42, 44 n.7 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.  Neither the reviewing court nor the defendant "may create or adopt post-hoc rationalizations to support the ALJ's decision that are not apparent from the ALJ's decision itself." *Hague v. Astrue*, 482 F.3d 1205, 1207-08 (10ᵗʰ Cir. 2007); *see also Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 50 (1983) (citations omitted) ("It is well-established that an

agency's action must be upheld, if at all, on the basis articulated by the agency itself.")

## IV. Discussion

### A. General Considerations

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.  *Plaintiff's Alleged Errors***

As set out above, Plaintiff asserts the decision of the Social Security Administration is error for the following reasons: the ALJ's finding that Plaintiff retained the RFC to perform a range of light work is not supported by substantial evidence; the ALJ failed to properly evaluate the medical and non-medical evidence; and the ALJ's step five finding lacks the support of substantial evidence. (Doc. 9 at 12.)

**1.  <u>Ability to Perform Range of Light Work</u>**

Plaintiff maintains that the ALJ's determination that Plaintiff was able to perform a range of light work is not supported by substantial evidence for a number of reasons.  (Doc. 9 at 13-18.)  She first notes that if the ALJ had found her limited to a range of sedentary work, "she would have been constrained to find, at least as of August 2011, that Plaintiff was disabled under GRID Rule 201.09, 20 C.F.R. Part 404, Subpart P, Appendix 2."[3] (Doc. 9 at 13.)  This is more observation than argument and we need not address it further.

**a.  Weight of "Other Source" Opinions**

Plaintiff next turns to the weight attributed to the opinions of her primary treating source Jon Vogler who is a certified physicians' assistant and provider Steven Heffner who is a chiropractor--arguing that their opinions were not properly

---

[3]  Plaintiff turned fifty in August 2011.  (*See* R. 48.)

38

considered pursuant to SSR 06-03p.  (Doc. 9 at 14.)  We conclude this claimed error is without merit.

20 C.F.R. § 404.1513(a), "Medical and other evidence of your impairment(s)," provides that evidence from acceptable medical sources is needed to establish a medically determinable impairment and identifies the sources who can provide such evidence. Physician's assistants and chiropractors are not included in the list of "acceptable medical sources."  The regulation also provides that "other sources" may be used to show the severity of an impairment and how it affects the claimant's ability to function. 20 C.F.R. § 404.1513(d).  Pursuant to § 404.1513(d)(1), "other sources" include physicians' assistants and chiropractors, whose opinions may, but need not, be considered.  *See also Chandler v. Commissioner of Social Security*, 667 F.3d 356, 361-62 (3d Cir. 2011).  The regulation, supported by caselaw, makes consideration of an opinion from a medical source who is not technically deemed an "acceptable medical source," optional.

However, Social Security Ruling 06-03p, 2006 WL 2329939 (S.S.A. Aug. 9, 2006), clarifies how opinions from sources who are not "acceptable medical sources" are considered.  *Id.* at *1.  The ruling explains that the distinction between "acceptable medical sources" and other health care providers who are not "acceptable medical sources" is necessary for three reasons: 1) evidence from "acceptable medical sources" is necessary to establish the

39

existence of a medically determinable impairment, *id.* at *2 (citing 20 C.F.R. § 404.1513(a) and 416.913(a)); 2) only "acceptable medical sources" can give medical opinions, *id.* (citing 20 C.F.R. § 1527(a)(2) and 417.927(a)(2)); and 3) only "acceptable medical sources" can be considered treating sources whose medical opinions may be entitled to controlling weight, *id.* (citing 20 C.F.R. § 404.1502 and 416.902).  "Opinions from these medical sources who are not technically deemed 'acceptable medical sources' . . . are important and should be evaluated on key issues such as impairment severity and functional effects."[4]  *Id.* at *3.  They can also be important as evidence that tends to support or contradict medical

---

[4]  The ruling provides the following reason for consideration of opinions from medical sources which are not "acceptable medical sources":

> With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.

SSR 06-03p, 2006 WL 2329939, at *4.

Of general note, "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" *Sykes v. Apfel*, 228 F.3d 259, (3d Cir. 2000) (quoting 20 C.F.R. § 402.35(b)(1)(1999)).

opinions. *Id.* at *4. The factors considered in the evaluation of opinions from "acceptable medical sources" as identified in 20 C.F.R. § 404.1527(d) and 416.927(d) can also be applied to "other source" opinions including the following:

- How long the source has known and how frequently the source has seen the individual;

- How consistent the opinion is with other evidence;

- The degree to which the source presents relevant evidence to support an opinion;

- How well the source explains the opinion;

- Whether the source has a specialty or area of expertise related to the individual's impairment(s); and

- Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5.

SSR 06-03p states that "[a]fter applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source." *Id.* at *5. By way of example, the ruling explains that "it may be more appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and

41

better explanation for his or her opinion." *Id.*  The Third Circuit Court of Appeals specifically noted that a treating physician's assistant is entitled to some weight as an "other source."[5] *Sanborn v. Commissioner of Social Security*, ---F. App'x---, 2015 WL 3452872, at *3 (3d Cir. June 1, 2015) (not precedential).

Relying on SSR 06-03p, Plaintiff asserts the ALJ does not acknowledge that the Vogler and Heffner opinions are entitled to consideration.  (Document 9 at 14.)

A formulaic consideration of evidence is not required--an ALJ is not obligated to consider every factor outlined in SSR 06-03p but must offer adequate reasons for discounting the "other source" opinion.  *See Sanborn*, 2015 WL 3452872, at *5.  It is clear from the decision that ALJ Smith considered the Vogler and Heffner opinions, properly noted they were not entitled to controlling weight, and identified other reasons for discounting the opinions. (*See* R. 46.)  The lack of objective medical evidence and the fact that the opinions from "other sources" contradict the opinions of two "acceptable medical sources," cited by the ALJ are adequate

---

[5]   Where a physicians' assistant or nurse practitioner works under a physicians' close supervision, some courts have held that the "other source" could be considered a medically acceptable source.  *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir. 1996); *see also Molina v. Astrue*, 674 F.3d 1104, 1111, 1112 n.3 (9th Cir. 2012) (citing *Gomez* and noting that *Gomez* relied in part on language in 20 C.F.R. § 416.913(a)(6) regarding the report of an interdisciplinary team and that language has since been repealed).

Here no evidence suggests, nor does Plaintiff argue, that Mr. Vogler or Dr. Heffner were under a physicians' close supervision.

reasons to discount the Vogler and Heffner opinions.[6]

**b.   Use of Cane**

Plaintiff next cites the ALJ's determination that Plaintiff's cane is not medically necessary, characterizing it as "extremely unreasonable."  (Doc. 9 at 15.)  We conclude this claimed error is not cause for remand.

------

[6]  Though the ALJ did not specifically address the factors set out in SSR 06-03p, a review of those factors would not have warranted a different conclusion.  *See* 2006 WL 2329939, at *4-5.

Mr. Vogler reports that he began treating Plaintiff in 2007 (R. 314) and he saw Plaintiff frequently, but our review of the progress notes set out in the text shows that back-related problems were not often the subject of the office visits.  Mr. Vogler's opinion is inconsistent with that of the "acceptable medical sources," diagnostic findings, his own progress notes, and Plaintiff's inconsistent subjective reporting exemplified by statements made to Dr. Nielsen regarding the extent of her pain, medications, and her activities of daily living.  Mr. Vogler's cited supporting evidence is primarily anecdotal, subjective and/or conclusory. (R. 314, 538-39.)  Mr. Vogler does not have a specialty or area of expertise related to Plaintiff's back impairment.

Dr. Heffner reports that he began treating Plaintiff in 2008 and sees her monthly (R. 1036) but the record is devoid of any treatment records--only a July 23, 2010, Medical Source Statement (R. 315-20) and December 2, 2012, Multiple Impairment Questionnaire (R. 1030-37) are contained in the record.  Dr. Heffner's opinion is inconsistent for the same reasons cited regarding Mr. Vogler's opinion.  Dr. Heffner's supporting evidence is based on the functional capacity examination conducted on the date of the report as well as subjective and/or anecdotal evidence.  Dr. Heffner does not have a specialty or area of expertise related to Plaintiff's back impairment.

SSR 96-9p sets out the parameters for finding that a hand-held assistive device is medically required.  SSR 96-9p, 1996 WL 374185, at *7.  The ruling provides that "[t]o find that a hand-held device is medically required, there must be medical documentation establishing the need for the hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed.  *Id.*

Plaintiff's citations to the record in support of her argument do not point to any medical documentation that the cane is *medically required*.  Her own recitation of the evidence concerning her limp shows the inconsistency with which she presented.  (*See* Doc. 9 at 15-16.)  Although Plaintiff points to the fact that she testified Mr. Vogler was the prescriber of her cane in 2008 (Doc. 9 at 16; *see* R. 64, 65), no objective evidence supports the testimony.  Rather, Mr. Vogler's extensive treatment notes indicate that at times Plaintiff was observed using a cane with no reference to its *necessity* outside his opinions of July 2010 and July 2011.[7] The ALJ cited the contradictory evidence regarding Plaintiff's need for a cane, including her report to Dr. Nielsen that she did not need a cane when at home, Dr. Nielsen's observations about her gait

---

[7] Defendant's brief provides extensive citation to the sporadic documentation of the usage of a cane.  (*See* Doc. 14 at 28-30.)  The first time we find the use of cane observed at an office visit was in January 2011.  (R. 866.)  This is noteworthy given Plaintiff's testimony that the cane was prescribed by Mr. Vogler as medically necessary in 2008.  (R. 65.)

44

and walking ability, Dr. Tuffaha's notation that Plaintiff's gait was steady in April 2009, similar findings by another provider in March 2010, and Plaintiff's report to Dr. Sampson in March 2012 that before she got sick in August 2011 with Legionnaire's disease, she was able to walk a mile or mile and a half.  (*See* R. 45 (citations omitted).)  Given the contradictory evidence of record, the fact that no "acceptable medical source" found that a cane was medically necessary, and the ALJ's adequate discussion of the issue, we conclude the ALJ did not err on the basis that she did not find that the record supported Plaintiff's allegation that she must use a cane.

**c.   Postural Limitations**

Plaintiff asserts that the ALJ erred in her RFC determination because she does not include limitations regarding balancing, stooping, kneeling, crouching and crawling--limitations found by state agency medical consultant Mark Bohn, M.D., whose opinion the ALJ gave great weight.  (Doc. 9 at 16 (citing R. 47, 532).) Plaintiff adds that the ALJ's failure to include any postural limitations in her RFC "is unsupported by the overwhelming evidence of record."  (Doc. 9 at 17.)  We conclude the ALJ's treatment of Plaintiff's postural limitations is cause for remand.

Courts "have discouraged ALJs from picking and choosing, without explanation, among portions of an uncontradicted opinion." *Crowder v. Colvin*, 561 F. App'x 740, 745 (10th Cir. 2014) (citing

*Chapo v. Astrue*, 682 F.3d 1285, 1291-92 (10th Cir. 2012); *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007).  Courts have also found that the inconsistent use of a medical opinion, without explanation by the ALJ, may be cause for remand.  *See*, *e.g.*, *Pike v. Colvin*, , 2015 WL 1280484, at *7 (W.D.N.Y. Mar. 20, 2015) (listing cases) ("cherry-picking" either within an opinion or among opinions constitutes improper assessment).

While Dr. Bohn's opinion may be contradicted by Dr. Nielsen's opinion that Plaintiff had no limitations, the ALJ did not make this distinction.  The ALJ listed Dr. Bohn's postural limitations in her review of his opinion and did not eliminate his postural findings from her determination that the opinion was entitled to great weight.  (R. 47.)  Rather, except for environmental limitations, the ALJ unqualifiedly endorsed his opinion:

> Dr. B[o]hn's opinion is also given great weight in determining the claimant's residual functional capacity because it is a medical opinion.  This opinion is reasonable in light of the minimal findings in the diagnostic images and during physical examinations.  Moreover, Dr. B[o]hn has program knowledge and based his opinion on a complete review of the medical evidence.

(R. 47.)  In contrast, the ALJ gave Dr. Nielsen's opinion only "some weight," specifically noting that "considering the claimant's subjective complaints, the undersigned finds that she has some limitations stemming from her back impairment, even though the objective evidence is minimal."  (R. 46.)

46

The inconsistent use of Dr. Bohn's opinion is problematic because the postural limitations were neither discounted in the RFC determination explanation nor mentioned in the ALJ's discussion of SSR 85-15.  (*See* R. 46.)  Defendant argues that the claimed error is without merit: "even assuming that she was limited to occasional stooping, . . . Social Security Ruling 85-15 states that the light occupational base is 'virtually intact.'" (Doc. 14 at 27 (citing SSR 85-15, 1985 WL 56857, at *7 (S.S.A.)).)  This argument infers that if the ALJ's analysis were considered error it should be deemed harmless.  To determine if this is the case, we review the relevant portion of SSR 85-15; if the provision indicates that recognition of the limitations set out in Dr. Bohn's opinion would not have an effect on the occupational base, then the ALJ's failure to include them or explain or reason for doing so would be harmless error.

> Limitations in climbing and balancing can have varying effects on the occupational base, depending on the degree of limitation and the type of job. . . . Where a person has some limitation in climbing and balancing and it is the only limitation, it would not ordinarily have a significant impact on the broad world of work. . . . Where the effects of a person's actual limitations of climbing and balancing on the occupational base are difficult to determine, the services of a VS are necessary.
>
> *Stooping*, *kneeling*, *crouching* and *crawling* are progressively more strenuous forms of bending parts of the body . . . . Some stooping is required to do almost any kind of work . . . . If a person can stoop

> occasionally . . . in order to lift objects,
> the sedentary and light occupational base is
> virtually intact.  This is also true for
> crouching . . . . However, crawling on hands
> and knees and feet is a relatively rare
> activity even in arduous work, and
> limitations on the ability to crawl would be
> of little significance in the broad world of
> work.  This is also true of kneeling.

1985 WL 56857, at *6-7.

Considering Dr. Bohn's conclusion that Plaintiff could occasionally climb, balance, stoop, kneel, crouch, and crawl in the context of the guidance provided by SSR 85-15 indicates that the ALJ's failure to acknowledge these limitations can be considered harmless error in some aspects but not in others.  According to the ruling, Plaintiff's limited ability to stoop, kneel, crouch, and crawl would leave the light occupational base "virtually intact." 1985 WL 56857, at *7.  Therefore, the ALJ's failure to address these limitations in her RFC assessment at most would be harmless error.  However, the ruling treats climbing and balancing differently: such a limitation would not ordinarily have a significant impact on the broad world of work if "it is the only limitation."  *Id.* at *6.  Here Plaintiff's limitations in these areas are not the only limitations.  Because the ALJ did not explain her decision to exclude them, we do not know the extent to which the effects of Plaintiff's climbing and balancing limitations were difficult to determine and whether the services of a VS were necessary.  We decline to consider this harmless error for two main

reasons: balancing was consistently a major issue identified by Plaintiff and "other sources"; and the failure to consider these limitations potentially impacts the ALJ's step five analysis. Important in the latter consideration is the fact that the Acting Commissioner bears the burden at step five to show that jobs exist in the national economy that Plaintiff could perform, *Mason*, 993 F.2d at 1064, and this burden is to be strictly construed, *Dobrowolsky*, 606 F.2d at 406.  Thus, we conclude that this matter must be remanded for further consideration regarding the limitations established in Dr. Bohn's opinion and their impact on the ALJ's step five determination.

**d.    Obesity**

Plaintiff maintains that the ALJ failed to explain how she accounted for Plaintiff's obesity in finding that she was capable of performing light work.  (Doc. 9 at 17.)  We agree with Defendant that no work restrictions related to Plaintiff's obesity were established in the record.  (Doc. 14 at 32-33.)  However, because we have determined that this matter must be remanded, and because the ALJ provided only the conclusory statement that she considered Plaintiff's obesity "in determining [her] residual functional capacity," we request the ALJ to provide a further explanation for her conclusion upon remand.

**2.    <u>Step Five Determination</u>**

Plaintiff's final argument is that the ALJ' step five finding

that she is not disabled lacks substantial evidence.  (Doc. 9 at 18.)  Because we have determined that remand is required and that the ALJ's step five determination must be reevaluated in light of the postural limitations discussed above, we will not further address Plaintiff's claimed step five error in that the Acting Commissioner must revisit her decision at this stage and *fully* explain her conclusions.  As set out above, SSR 85-15 may require the use of a VS in this case; at the very least, it requires a more detailed explanation of why such services would not be required.

### V. Conclusion

For the reasons discussed above, we conclude Plaintiff's appeal is properly granted.  This matter is remanded to the Acting Commissioner for further consideration consistent with this opinion.  An appropriate Order is filed simultaneously with this Memorandum.

S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge

DATED: June 29, 2015